### SMIDTH v. BONNEVILLE CEMENT CO.

(Circuit Court, E. D. Pennsylvania. February 12, 1901.)

#### No. 35.

PATENTS—ANTICIPATION—TUBULAR BALL MILLS.

The Davidsen patent, No. 548,115, for improvements in tubular ball mills for pulverization of various materials, the mill described consisting of a combination of a rotary drum having an approximately horizontal axis, and provided with an axial inlet at one end and a peripheral outlet near the other end, and a body of grinding balls disposed in mass in said drum, was anticipated by the device of the Redfern British patent for a mill which embodies the same combination. If conceded novelty, the patent must be restricted to the exact device shown, in view of the prior art, and is not infringed by a mill divided into compartments by vertical partitions, through each of which, in succession, the material must pass, and having its outlet in the end, instead of the periphery.

In Equity.   Suit for infringement of patent.   On final hearing.

Louis C. Raegener, for complainant.

W. A. Jenner, for respondent.

J. B. McPHERSON, District Judge.   This extended record relates to an alleged infringement of letters patent No. 548,115, granted to Joseph Davidsen on October 15, 1895, for improvements in tubular ball mills for pulverization of various materials.   No good purpose would be served, I think, by an elaborate discussion of the questions involved, and I shall content myself, therefore, with little more than a brief statement of the conclusions to which I have come.

The material parts of the specification are as follows:

"The object of the invention is to secure a thorough comminution of the matter to be ground in a simple and economical manner.

"The invention consists principally in the combination of a rotary drum having a horizontal or approximately horizontal axis, and provided with a central inlet at one end and a peripheral outlet at or near the opposite end, and a body of grinding balls disposed in said drum, and overlying one another in mass therein, the weight of the mass of balls upon the passing stream of material increasing from the inlet to the outlet of the drum.   The material to be ground, entering the drum at the center of one end thereof, forms a bed or mass of material at said end of a depth equal to that portion of the radius of the cylinder which extends from the periphery thereof to the outer diameter of the inlet, and this depth of material gradually decreases from the inlet at one end to the outlet at the other, forming a thin layer or stream at the outlet end.   Thus the weight and depth of the balls over the thin stream of material at the discharge end of the drum are much greater than at the inlet end, and this depth and weight increase from the inlet to the discharge end as the stream of material diminishes, so that the grinding action of the mill is greatly increased as the grinding proceeds and the material becomes thoroughly comminuted before it leaves the drum.   This result is due to the mass of the balls in a drum having an elevated inlet and a peripheral outlet. * * *

"Fig. 1 shows the simplest form of my improved pulverizing apparatus. It consists of a drum (a), provided with pivots at both ends.   One of these pivots is hollow, and through the same the feed or supply is effected.   At the other end the drum has a number of discharge openings in the periphery smaller than the balls used for grinding.   Through these openings (d) the finished powder leaves the drum.   The drum is always kept half full, more or less, of balls disposed in mass in the drum in contact with one another, except as they are separated by the material being ground, and the drum is rotated by a driving gear with cogwheels (c).   (m) is the supply chute, and (p) the discharge chute. * * *

"In such cases where the material to be treated is of a highly abrading nature, or where it is of importance that it does not come into contact with iron, the interior of the tube can be filled with a protecting cover.   This can be made of iron, steel, stone, wood, china, or baked clay.   The balls can in a like manner be made of the above-mentioned or other suitable materials.

"The material being ground, on entering the drum at an axial inlet and leaving it at a peripheral outlet, forms a gradually diminishing stream, extending from the inlet to the outlet end of the cylinder: and, as shown in Figs. 2 and 3, as the stream diminishes the depth of balls above it becomes greater.   Consequently the weight and grinding action are gradually increased from the inlet to the outlet, or from one end of the cylinder to the other; and as the material is discharged it is in a finely comminuted state. No blowing apparatus is required to pass the material through the drum.   In the conical drum, the peripheral outlet being at the larger end, the increase in weight and grinding action is greater than in the cylindrical form."

The claim is for a combination of elements, namely:

"In a tubular ball mill, the combination of a rotary drum having a horizontal or approximately horizontal axis, and provided with an axial inlet at one end and a peripheral outlet near the other end, and a body of grinding balls disposed in mass and overlying one another in said drum; the stream of material passing between the balls being gradually diminished from the inlet to the outlet, and the depth and weight of the mass of balls above the material gradually increased as the stream diminishes."

The defendant uses tubular ball mills that are correctly described as follows in the brief of defendant's counsel:

"The defendant's mill is a tubular ball mill, and comprises a cylindrical drum about 21 feet in length by about 5 feet in diameter, divided into five compartments by means of four vertical partitions, arranged at right angles to the axis of the drum. The first and second compartments are of about the same length, and are longer than the third and fourth compartments, the first and second being each about twice as long as either the third or the fourth, which latter two are of about equal size. The fifth compartment is very short, and is used only for discharging the ground material from the mill. The first, second, third, and fourth compartments contain grinding balls. The fifth compartment has no grinding balls. The first and third partitions permit of the passage of the ground material by means of a series of holes near the inner periphery of the drum. The second and fourth partitions permit of the passage of material between the respective adjacent compartments by means of a series of holes nearer the axial center of the partitions. For brevity's sake, we number the compartments from first to fifth, beginning at the inlet end, and number the partitions in like order first to fourth. Each partition has circular rows of small holes, each about one-half inch diameter. The rows are about 3 inches apart. Each hole is about 6 inches from the nearest holes in the same row. In the first and third partitions the outer row of holes is about 3 inches from the inner side of the drum's periphery, and the inner row of holes is about 15 inches from the axial center. In the second partition the outer row of holes is over 12 inches from the inside of the drum's periphery, and the inner row of holes is about 10 inches from the axial center. In the fourth partition the outer row of holes is 11⅛ inches from the inside of the drum's periphery, and the inner row of holes is about 14¼ inches from the axial center. Each compartment is filled with stone balls or pebbles to the extent of about 40 per cent. of their capacity. The holes in the partition are of a size to permit the ground material to pass through, but to restrain the balls.

"The material is fed to the mill by a hopper which is above one end of a screw conveyor which rotates within a tube, and its axial center is in line with the axial center of the mill. The mouth of the tube in which the screw conveyor works is considerably wider than the tube itself. The operation of the screw conveyor is such that the material to be ground is brought along by it and drops into the mill some distance from the axial center of the mill, the axial center of the mill being occupied by the conveyor shaft.

"The material to be discharged from the mill must enter the fifth compartment. In this compartment is a cone, which is attached to the fourth partition. The cone is in line with the axial center of the mill. Angle irons are attached to the inner side of the end wall of the drum. These angle irons lift the ground cement in the fifth compartment. The falling cement strikes the cone, and is directed outwardly thereby through the discharge spout."

In my opinion, the machine thus described does not infringe the complainant's patent, because the patent must be narrowly construed. Davidsen's application was rejected seven times by the patent office for want of novelty. During the course of the proceeding he conceded that the separate elements of his device were old, but endeavored to convince the office that the combination was novel. For example,

he argued in July, 1895, that "two old features are combined in applicant's apparatus, and produce therein a new result. These features are the relative arrangement of the inlet and outlet openings in the drum in connection with the balls disposed en masse in the said drum. This combination produces a new result. It causes a constant increasing weight of grinding balls on the gradually diminishing stream of the material passing through the drum." After persistent urging, the patent was finally issued, but with evident reluctance, the examiner saying: "Further search and consideration seem to show that the prior art falls slightly short of positively disclosing the specific combination claimed, although there is grave doubt whether there is invention in it in view of Close and Robertson. * * *" This doubt, I think, was abundantly justified by the patents referred to by the examiner, and these lead inevitably to the conclusion that the complainant is to be restricted to his exact device. Thus restricted, the defendant's mill seems to be substantially different in at least two respects: First, it is divided into compartments, not as a mere evasion of the complainant's undivided cylinder, but for the purpose of retarding further the flow of material, in order that grinding may be more complete; and, second, it does not have a peripheral outlet, but an outlet in the end of the cylinder.

I think, also, that the complainant's mill lacks novelty in view of the British patent to Redfern, granted in 1888, as will appear by the following quotations from the patent:

"This invention relates to that class of grinding apparatus in which loose balls or the like are employed for grinding or crushing the substances, the object being to cause the said substances to travel horizontally through the apparatus at a speed varying with the hardness of the substances and the degree of fineness which it is required to obtain.

"In most existing apparatuses of this class, the introduction and discharge of the substances is effected intermittently, and a stoppage of the apparatus is, therefore, necessary if it is provided with doors operated by hand; or mechanism is employed for opening these doors while in operation, as well as an Archimedian screw for feeding through the center if the apparatus is continuous in its action, but the feed and discharge of the substances is intermittent. The only grinding apparatuses in which there is a continuous feed of the substances are centrifugal machines, bolting mills, or grinders and grinding apparatus in which a blast of air is employed. These apparatuses, however, are of complicated construction, and are costly to keep in repair. A very small product results from them, and for many purposes they are useless; such, for example, as for rendering some substances homogeneous. * * *

"In carrying out this invention, the apparatus comprises a cast-iron cylinder, the inner surface of which is corrugated. The substances to be ground are introduced continuously through a channel, LK, at one end of the cylinder, and are continuously discharged through openings, P, P, P, made in the other end of the cylinder, near the periphery thereof, the said openings being smaller than the crushing balls or the like. Or hollow arms provided with gratings can be employed for a like purpose, the discharge then taking place through the center.

"The balls have no movement of translation in the cylinder. If, for example, 800 kilogrammes of balls be employed, the rotating movement of the cylinder, which is placed horizontally, will spread them out or distribute them uniformly throughout the whole length thereof.

"If the substance to be ground be introduced at one end of the cylinder, it will mix with the balls, and will also become evenly spread over the whole length.

"The openings, P, P, P, are too small to allow the balls to pass out and sufficiently large to allow the ground material to pass out, so that in the interior of the pile of balls near the openings, P, P, P,—that is to say, towards the outlet of the cylinder,—the substance is more completely ground than that near the admission end.

"The rotation of the cylinder produces a continuous mixture of the balls with the substance, and this always tends to fill with the said substance the space between the balls throughout the whole length.

"It follows, therefore, that during the rotation of the cylinder a movement of translation of the mass therein takes place through the balls from one end to the other of the apparatus, whilst the balls themselves have no such movement of translation. The larger the quantity of the substance fed through the channel LK to the cylinder, the more rapid will this movement be; so that for a given speed and length of cylinder the fineness to which the substance is to be reduced will depend solely on the quantity regularly introduced and on the number of the balls.

"The openings, P, P, P, are of any suitable shape, provided, as before described, they are smaller than the balls, and placed opposite the admission end of the cylinder, either on the periphery, on the bottom, or on the hereinbefore mentioned hollow arms."

A large part of the testimony was devoted to this British patent, the complainant insisting that Redfern's mill was not capable of "grinding" material, but could only reduce it to a powder by the "percussive" action of the balls; thus, it was argued, assigning the mill to a different class of devices, and avoiding the charge of anticipation. I have read and considered the testimony and arguments upon this subject, and I am not prepared to take the complainant's view. On the contrary, I am satisfied that the Redfern mill is capable of grinding material precisely as the complainant's mill grinds it, although the proper rate of speed is different for the two machines. As it seems to me, the Redfern combination is essentially the complainant's combination; the complainant's lacking, therefore, the necessary element of novelty.

It may be proper to add that it does not appear to be important whether the stream of material in the complainant's mill gradually diminishes from the inlet to the outlet or not. This is a part of the patentee's theory of operation, but it is aside, I think, from the two structural elements of the patent. But, if it is important, it is thus far a theory only, not established by the testimony. It may be true, but it has not yet been proved.

The bill must be dismissed, at the complainant's costs.